IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE GUARDIANSHIP & CONSERVATORSHIP OF BROWN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP AND CONSERVATORSHIP OF WILLIAM C. BROWN,
AN INCAPACITATED AND PROTECTED PERSON.

HEARTLAND TRUST COMPANY, CONSERVATOR, ET AL., APPELLEES,
V.
STEVEN E. CLASON, APPELLANT.

Filed November 5, 2024.    No. A-23-1015.

Appeal from the County Court for Furnas County: TANYA K. ROBERTS-CONNICK, Judge. Affirmed.

Terry K. Barber, of Barber & Barber, P.C., L.L.O., for appellant.

Tana Fye, of Fye Law Office, for appellee conservator, Heartland Trust Company.

Justin Daake, of Daake Law Firm, appellee guardian ad litem.

Jack Besse, of Parker Gossart Law Firm, appellee guardian.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Steven E. Clason appeals from the orders entered by the county court for Furnas County appointing a permanent guardian and conservator for William C. Brown (Brown), and ordering Clason and his attorney to pay attorney fees for filing frivolous motions in this case. We affirm.

## II. BACKGROUND

Brown, born in 1942, has two adult daughters, Dawn Hildreth and Ramona Gail Brown (Gail). At some point, Clason moved into Brown's residence. On February 24, 2021, Brown executed a "Durable Power of Attorney" appointing Clason and Gail as coagents and

attorneys-in-fact. Clason continued to live with Brown until Hildreth initiated guardian and conservator proceedings.

## 1. INITIAL PLEADINGS

On January 10, 2023, Hildreth filed a "Petition for Appointment of Temporary and Permanent Guardian and Conservator" for Brown. Hildreth alleged the following. Brown was 80 years old. He had been a farmer in Furnas County over the course of his adult life and currently owned approximately 670 acres of real property, which consisted of farmland, grassland, a house, buildings, and equipment. He owned certain personal property, cash, assets, and livestock. His assets and property were valued at more than $1 million. Brown had suffered recent medical issues, including a stay in a nursing home in approximately April 2021 during which he was diagnosed with dementia and/or Alzheimer's. He had become more frail, no longer farmed or ranched, and no longer managed or had control of his assets, finances, and property. He lacked the ability to make, communicate, and carry out responsible decisions regarding his person, affairs, and financial affairs. As a result, Brown was susceptible to pressure, undue influence, unfettered control by others, and elder abuse.

Hildreth alleged the following regarding Clason. Clason came into Brown's life, did not have a residence of his own, and instead had been living at Brown's house and using Brown's money, property, and resources as if they belonged to him. Clason had improperly assumed complete control of Brown's personal, business, and financial affairs. Clason had been farming and ranching Brown's land, had access to and had been using his financial accounts, and had been using his equipment without Brown fully understanding, appreciating, or approving of Clason's actions. Brown did not have the ability to fully understand the nature and extent of Clason's actions, to direct Clason to stop his malfeasance, or to comprehend the financial repercussions that Clason's actions were having on him. Clason's actions wasted and dissipated assets, finances, and income belonging to Brown. Clason isolated Brown and kept him away from others, all in an effort to control him and take advantage of his fragile state. Clason disconnected the landline phone at Brown's house and took Brown's cell phone from him so that he had no access to the outside world, and Clason locked the house while he was away so that no one could enter the house and communicate with or check on Brown. Clason refused to give Hildreth access to her father, dictated the terms of when and how she could speak with her father, and refused to provide her with information regarding her father's health, well-being, and financial affairs. Hildreth also made allegations regarding Clason's litigious, financial, and criminal history.

Hildreth nominated herself as the proper person to be appointed Brown's guardian and conservator, both on a temporary and permanent basis.

The county court appointed Hildreth as temporary guardian and conservator on January 10, 2023. The court also appointed a guardian ad litem (GAL) for Brown and ordered Brown to be evaluated by Dr. Rachelle Kasper-Cope.

On January 30, 2023, Clason filed a lengthy document which essentially objected to the appointment of a guardian and conservator and requested a hearing. Clason's filing included a copy of the Durable Power of Attorney signed by Brown on February 24, 2021.

## 2. TEMPORARY GUARDIANSHIP

A hearing was held on February 13, 2023, to determine if a temporary guardianship was necessary. Clason appeared as an intervenor and was not represented by counsel. The GAL's report dated February 10, 2023, was received into evidence. According to the report, Brown was "incapacitated per dementia and/or cognitive decline" and a "full" temporary and permanent guardianship and conservatorship were recommended; the report stated that medical records "indicate a diagnosis of dementia dating back to at least April 2021." The GAL's review of "various pleadings on JUSTICE" led him to believe "it is unlikely that Mr. Clason can pass the required background checks" to be the guardian and/or conservator. The report noted that it had been alleged that Hildreth had a felony theft conviction in Missouri, but the GAL had not been able to confirm that fact; if true, "said conviction is likely prohibitive as well." The report stated that Gail was not interested in seeking appointment as guardian or conservator at this time.

Clason presented evidence via his sister, Ruth Gove. Gove, a registered nurse for over 50 years, testified that she came to know Brown "[t]hree years ago" and "[i]t was obvious to [her] after having meals with [Brown] that he had dementia"; she suspected Brown had dementia "[p]robably the first time [she] met him." According to Gove, Hildreth came to help Brown for 7 days in early October 2020 and then left without setting up any resources for him. Gove helped Brown with meals and arranged for a weekly housekeeper, and her sons and Clason helped Brown with his farm chores. Gove stated, "I feel like since [Brown has] had proper nutrition the last two years, you know, and a safe environment, haircuts, clean clothes, a decent bed to sleep in, I feel like his dementia has improved somewhat."

Also received into evidence were medical records from Dr. Kaspar-Cope. She examined Brown on January 17 and 24, 2023, and assessed him as having dementia, among other things.

Hildreth's counsel argued that Brown required around-the-clock care, and that Hildreth "is doing that as the temporary guardian in the case." Counsel asked the court to deny Clason's motion. Clason argued that Brown had been "taken out of the hands of someone that was taking care of him." Clason was also "concerned" that this was an attempt to "go in the backdoor when there is a durable power of attorney." The GAL argued that Gove noted signs of dementia going back to 2020, which predated the power of attorney.

The county court orally ruled on the record as follows:

> So, on the temporary basis, the Court is going to find that by a preponderance of the evidence that [Hildreth] has met the burden of showing that a temporary guardianship continues to be necessary to address the emergency situation, that being Mr. Brown's day-to-day care, management of his assets. However, the Court is going to limit any powers by the temporary conservator that she is not to transfer any assets without court order, she's not to pay herself or her attorney without court order, she's to have payment and receipt of day-to-day bills only . . . there will be no other transfer allowed, that would be absolutely illegal at this point, and so the Court is going to require a reporting from that period of time.

The court "on a temporary basis," continued the appointment of the temporary guardian and conservator.

### 3. STIPULATION

A hearing was held on April 10, 2023; Clason was now represented by counsel. The county court judge stated that just prior to the hearing, "the attorneys approached" her in chambers and asked her to "give the feeling of the Court regarding who is appropriate to serve at this point if it is determined that Mr. Brown needs a conservator." "[I]t's the Court's view, based on evidence at a prior hearing . . . that neither [Hildreth] or Mr. Clason are suitable, based on their backgrounds and information provided by the [GAL]," "and generally, in these sort of circumstances, the Court feels that a neutral party is in the best interest of the ward." The court asked if the attorneys wanted to take some time and talk with their clients to see if there could be any sort of agreement as to who should be appointed. Hildreth's attorney asked the court if it was willing to share any thoughts on the "guardian stuff." The court said, "[T]hat's also a discussion that you can have with your clients."

After a 16-minute recess, the hearing resumed. Clason's counsel addressed the court, stating:

> Your Honor, after having talked at some length with Mr. Clason about this case and in particular about what you've indicated to us as far as your inclinations are concerned, we are willing to agree, first of all, to Mr. Brown's diminished capacity and need for a guardian and conservator in this case.

Clason's counsel stated that they also agreed to the appointment of Heartland Trust Company as conservator for Brown. And Clason's counsel confirmed that he was "offering a stipulation." The GAL joined in that stipulation. The court received the GAL's report dated April 5, 2023, "for purposes of a basis for receiving the stipulation of the parties that Mr. Brown is incapacitated and in need of a permanent guardian and conservator." Clason and Hildreth both personally confirmed to the court that they were stipulating to the need for a permanent guardian and conservator. And Clason and Hildreth both personally confirmed their agreement to have Heartland Trust Company appointed as the permanent conservator. The court found that Heartland Trust Company was a suitable institution to be appointed and said, "we'll appoint Heartland Trust Company as the permanent conservator for . . . Brown."

With respect to the permanent guardianship, Clason's counsel stated that Clason was not going to seek appointment as guardian. Hildreth, however, was still seeking appointment as guardian. The county court noted that it had been asked to state what it believed regarding the suitability of Hildreth. It said that given the information received by the court at this hearing and a previous hearing, it did not believe Hildreth was suitable "given her criminal history" and "friction between the parties." Hildreth's counsel asked for "some time" for Hildreth to "process things, to think about if she's going to withdraw her request to be nominated as guardian." The court set an evidentiary hearing for May 26, 2023.

### 4. PLEADINGS AND ORDERS FOLLOWING STIPULATION

On May 1, 2023, Hildreth's counsel filed a motion to withdraw as counsel of record, stating that they no longer represented Hildreth and that she would be finding substitute counsel. That motion was subsequently granted.

On May 10, 2023, Heartland Trust Company filed a "Motion to Remove Temporary Guardian," Hildreth. In support of its motion, the affidavit of Lucas Swartzendruber, president of Heartland Trust Company, was referenced therein and filed that same day. In his affidavit, Swartzendruber stated that after Heartland Trust Company was appointed as conservator for Brown on April 10, it obtained Brown's bank statements. A review of those bank statements revealed "several suspect transactions including large cash withdrawals, Venmo transactions, payments to Poshmark and a payment to the Missouri Department of Corrections." Having learned that Hildreth was no longer represented by her counsel, Swartzendruber conducted a videoconference with Hildreth on May 5, and she was asked about the suspect transactions; Hildreth informed Swartzendruber that the Venmo and Poshmark transactions and the payment to the Missouri Department of Corrections were for her benefit and the funds were used to pay her personal bills. Swartzendruber "believe[d] that the suspect transactions rise to the level of either theft or abuse of a vulnerable adult." He stated that Hildreth "was previously convicted of felony theft in Missouri, and is currently on probation in that case," and "[o]ne of the conditions of her probation is that she is prohibited from 'employment involving finances of another and/or in-home or residential care.'" Heartland Trust Company asked the county court for an ex parte ruling removing Hildreth as temporary guardian and authorizing the GAL to exercise the powers of guardian until further order of the court. Finding "[g]ood cause," the court entered the ex parte order that same day, May 10.

On May 22, 2023, the county court judge who had been presiding over this case recused herself.

5. HEARING ON MAY 26, 2023

At the hearing on May 26, 2023, the newly assigned judge noted that she had been assigned to the case earlier that week, and had "read through the file, including all of the last minute pleadings that came in up until yesterday afternoon." The county court then noted that Clason had filed a motion to withdraw from the stipulation, a motion to remove fiduciaries, and a motion to dismiss the proceedings. The conservator had filed a "Motion for Court Approval of Sale of Property." Finally, "the last thing on the Court's docket . . . [were] competing nominations of guardian for Mr. Brown"; "Clason has, through his attorney, nominated himself and/or in conjunction with . . . Gail Brown," Brown's GAL nominated the Office of Public Guardian, and the conservator nominated Jack Besse.

(a) Motions to Withdraw From Stipulation,
Remove Fiduciaries, and Dismiss Action

The county court first took up "[Clason's] Motion to Withdraw from Stipulation," and stated that "there was an objection filed by both [the GAL] and [the conservator]."

Clason argued that since the stipulation was entered in April 2023, "there have been a series of events that have changed the circumstances." He specifically pointed to (1) a motion to withdraw as counsel of record filed by Hildreth's attorney; (2) the conservator's May 10 motion to remove Hildreth from her position as temporary guardian, and the affidavit in support of that motion; and (3) the previous judge's May 10 order removing Hildreth as temporary guardian and

- 5 -

indicating that the GAL was to exercise those powers temporarily. When asked if he had other evidence, Clason's counsel stated, "That's all the evidence in support of this motion."

Clason's counsel argued that at the February 14, 2023, hearing, Clason had represented himself, that he had expressed his concerns about Hildreth being involved in providing care for her father and his estate; and that what Clason had represented in February was "in fact, the truth, that Ms. Hildreth should never had been appointed, that [her] petition should never have been entertained." Counsel argued that "[t]hese subsequent events . . . warrant the Court allowing us to withdraw from the stipulation." The county court asked Clason's counsel if he had any additional medical documentation or evaluations of Brown that were more recent than the ones before the court when the guardianship and stipulation were approved; counsel responded, "No, Your Honor."

The conservator had no evidence to present on the motions. The GAL offered into evidence his report dated May 23, 2023, and two supplements dated May 24 and May 25; those were received. In the May 23 report, the GAL stated that he "had not seen and [was] unaware whether [Brown] ever executed a Durable Power of Attorney for Health Care" (emphasis omitted); Brown was currently incapacitated and needed of a permanent guardian and conservator; and Clason was unfit to serve as guardian or conservator due to his criminal history and his history of filing bankruptcy. The report also stated that Brown was placed into a memory care facility on May 21. The May 24 supplement stated that Clason caused a scene at the memory care facility where Brown resided, and that Clason "ranted and yelled" at staff. The May 25 supplement related to Clason's history of criminal charges (including assault) and civil litigation.

Counsel for the conservator noted it filed an objection to the motions brought on behalf of Clason "for a whole host of reasons." Counsel for the conservator pointed out that Clason's counsel had not cited any legal basis or reason to support withdrawing from the stipulation; that there was no new information that would call into question Brown's incapacity or medical diagnosis of dementia, that nothing had changed in that regard; and "all of the records that [Clason's counsel] cited in his motions and offered here to the Court today have no bearing, really, on the issue of incapacity whatsoever." The conservator's counsel reminded the county court that the stipulation was entered into by each attorney and each party present at the hearing. "The Court went around the room and basically asked each individual person whether they agreed to that, and everyone did." Counsel added, "There's been no allegation made that they were somehow coerced into entering into that stipulation by the Court or any other person."

Counsel for the conservator also argued that all of the records that had been filed, including those Clason's counsel "just offered," "ultimately support the continued appointment of Heartland Trust Company as Conservator." Counsel for the conservator submitted that Clason's motions were made in bad faith and were frivolous, and it asked the county court to schedule an additional hearing regarding sanctions.

The GAL "agree[d] with everything that [the conservator] has said." The GAL also argued that there was "reason to suspect that the appointment of [Hildreth] probably was problematic . . . more or less from the very first hearing," because of her prior felony theft conviction, but that information was known prior to the parties' stipulation in April 2023. The GAL stated that prior to that stipulation, Gail had allegedly noticed suspicious transactions on Brown's financial accounts, and "[a]ll parties had that information" going into the stipulation hearing. "That was the

whole point: to get a new conservator appointed immediately." And "[n]othing that has since occurred in any way justifies having to litigate this matter."

In response, Clason's counsel argued that Clason, who had a copower of attorney over Brown, had cared for Brown prior to this litigation "and it was working famously."

The county court found that at the time of the April 10, 2023, hearing, the previous judge approved a stipulation entered into by all parties, including Clason, that Brown was incapacitated and that a guardianship and conservatorship were necessary. The court stated, "There's been no showing of duress on Mr. Clason that he did not freely, knowingly, intelligently and voluntarily enter into that conservatorship." There was no new medical information showing that Brown's situation had improved, "and, in fact, according to the [GAL's] report, his condition has deteriorated to the point he's in a memory care unit," reinforcing for the court that "the proper and least restrictive alternative for Mr. Brown was a guardianship." The court overruled Clason's motion to withdraw from the stipulation.

After hearing testimony from Swartzendruber and the GAL, and arguments from the parties, the county court overruled Clason's motions to remove the fiduciaries. The court once again noted that at the hearing on April 10, 2023, the parties stipulated that Heartland Trust Company would serve as the conservator in this matter. And the court found that Heartland Trust Company had fulfilled its duties and continued to fulfill its duties. The court also overruled Clason's motion to dismiss the action.

### (b) Motion for Approval of Sale of Property

After hearing testimony and arguments, the county court granted the conservator's amended motion for court approval of the sale of certain property.

### (c) Nominations for Guardian

After a brief recess, Clason's counsel stated that Clason was withdrawing his nomination to serve as guardian. The county court specifically asked Clason if he wanted to withdraw his nomination to serve as Brown's guardian. Clason replied, "For today, yes, I am withdrawing." The court told Clason, "I'm not going to let you withdraw today and then turn around and file again in two weeks, because that's, I think, a waste of probably resources of the parties and the Court's." The court again asked if Clason was willing to withdraw his nomination. After conferring with his counsel, Clason stated, "Yes, I am withdrawing." Clason's counsel then confirmed that they were withdrawing their pleading, which included the nomination of Gail. The court granted the motion to withdraw that pleading and stated that Clason and Gail "are no longer in contention to serve as the guardian."

The parties did not object to the appointment of Besse as temporary guardian, and the county court appointed him accordingly.

### 6. HEARING ON JUNE 16, 2023

A hearing on the appointment of a permanent guardian and on the motion for sanctions was held on June 16, 2023.

(a) Appointment of Permanent Guardian

The conservator, the GAL, and Hildreth were in favor of Besse being appointed as permanent guardian for Brown. However, Clason's counsel stated, "[W]e continue to believe that we should advocate for the benefit of the power of attorney that it is outstanding for Mr. Brown in which he appoints Mr. Clason and . . . Gail. . . as his power of attorney." The following colloquy was then had on the record.

> THE COURT: . . . I want to clarify your position on this, is your position that Mr. Besse is a not qualified person or your position is that a guardianship is not necessary at this time and you're advocating for the power of attorney in lieu --
>
> [Clason's counsel]: The second of those.
>
> THE COURT: Okay. So it's not necessarily an objection to Mr. Besse, it's an objection to just the guardianship in total, correct?
>
> [Clason's counsel]: That is correct.

Upon the request of the counsel for the conservator, and without objection by the parties, the county court took judicial notice of "all the testimony received and heard by this Court at the last court hearing, which would have been on May 26, 2023." Additionally, "[a]ny exhibits that have previously been offered and received by the court are offered and received again."

Clason called the GAL as a witness. The GAL testified that it was his understanding that at some point in 2021, Clason began to reside with Brown and provided his day-to-day care; this continued to be the case through 2022 and for the first few days of 2023, until Hildreth was appointed temporary guardian and conservator. "[A]s far as the physical care, I don't think that there's any reason to believe that [Clason] wasn't handling that effectively."

The GAL identified exhibit 34 as the power of attorney executed by Brown, dated February 24, 2021. (On cross-examination, the GAL noted that at the initial hearing, Clason's sister testified that Brown had a diminished capacity that predated the issuance of this power of attorney. Additionally, the power of attorney was not a healthcare power of attorney and did not authorize Clason to deal with any healthcare issues.) The GAL had no evidence that Clason had exploited Brown or his finances.

The GAL was asked if he agreed that the benefit of a power of attorney is that it is less restrictive than a full guardianship. The GAL responded that "[g]enerally, [he] would say yes, assuming that the individual that signed the power of attorney has capacity to withdraw the power of attorney." The GAL added that "the benefit of the power of attorney is . . . that it can be altered or amended at the whim of the individual granting" it. The GAL explained that it is less restrictive in that the "individual is still involved in the determination as to whether or not they feel that this agent is appropriately acting on their behalf at any given time." The GAL noted that a few days prior to the May 26, 2023, hearing, Brown was moved into a memory care facility after it was determined that he needed that level of care.

Clason's counsel asked the GAL if there was anything to indicate that healthcare providers were "stymied or otherwise unable to provide care to Mr. Brown because of a lack of health care power of attorney permissions." Counsel for the conservator objected, stating, "I don't know what relevance that would have to the issues of whether a permanent guardian should be appointed and

if so, who." Clason's counsel responded that under Nebraska case law, the court has to be satisfied about the subject person's incapacity, and that an appointment of either a guardian or conservator is necessary and is the least restrictive alternative. The following colloquy was then had on the record.

THE COURT: . . . [A]gain, my understanding is there was a stipulation that a guardianship -- and that was entered in to by all parties, that a guardianship was necessary for Mr. Brown's protection. [The previous judge] ordered that through a stipulation of the parties. And I think the Court noted that at the last hearing. So I've been giving you a little bit of leeway, but I know there is still that stipulation on record. So, [counsel], how is that relevant given the stipulation that the parties have entered in to that is still in effect?

[Clason's counsel]: . . . There's a couple of things, Judge. Even though there was a stipulation, and I have that journal entry in front of me, it indicates that what the judge determined was that all parties stipulate that Mr. Brown lacked capacity and needs a permanent guardian-conservator. That stipulation was made. I don't know that that eliminates what has been stated as being the law in Nebraska, first of all. . . . My level two response is, and . . . perhaps this ends up being an offer of proof, but I realize, too, that we have made a request to withdraw from that stipulation based on a change of circumstance. This Court, roughly three weeks ago, took up that request and denied it. . . . And we still believe that that cause exists. That is, you know, what we were talking about was matters that had been withheld from the Court, information that had been kept secret from the Court, which we think undermined the proceeding and in the same fashion that a new trial might be granted or an order might be vacated, I think the criteria of a) either newly discovered evidence, because what came up after the stipulation was things that had been secreted from the Court.

THE COURT: But none of those were --

. . . .

THE COURT: -- none of those were issues regarding Mr. Brown's capacity or being of the deal, those were more with actions taken by Ms. Hildreth, is that correct? And, so --

[Clason's counsel]: They were, but I think they speak to, for instance, the good faith in the original filing. I mean this is based on a petition that was filed by Ms. Hildreth.

THE COURT: And I think the Court's prior order was the time to address that would have been at the -- rather than at the time of the stipulation when it was scheduled for a contested hearing where I think there was witnesses subpoenaed and things of that nature. And I think the Court even inquired at the last hearing whether there was additional or new medical evidence that was discovered that affected that stipulation. And my understanding, at that time, their representation was that it was not. So at this point in time I'm going to sustain the objection regarding health care. And I think at the last hearing -- I think this was also covered to a degree, [counsel], about Mr. Clason's -- the care that he was providing for Mr. Brown prior to that. But I'm going to sustain the objection at this time, find that it's not relevant, about the care in the years of 2021 and 2022. Because since that time, the stipulation was put in to place and I think that the circumstances or the issues that I think you're referring to that I think your position is[,] is that they undermine the

original guardianship. I don't believe -- The Court's not swayed by that, because at that point in time, everything we're talking about after that was financial and everybody stipulated at the time of the hearing with [the previous judge] that a guardianship, a permanent guardianship, was necessary at this time. So I'll let you continue to explore the -- whether or not it is still a least restrictive alternative today, but let's talk about it in terms of today and the situation that Mr. Brown's in.

The GAL testified that Brown is incapacitated and "has no legal authority or ability to comprehend" the durable power of attorney. The GAL had "significant doubts whether or not [Brown] could even read that document, let alone nominate any other new person to serve as a separate power of attorney or to go complete a durable power of attorney for health care." The GAL believed Brown needed a court-appointed guardian and conservator to assist in his day-to-day care. On cross-examination, the GAL agreed that a guardianship was necessary and was the least restrictive alternative to meet Brown's needs. The GAL was asked if he believed that the 2021 power of attorney was dispositive as to who should serve as guardian in this case. He responded, "No," because Clason "is, I think, legally prohibited, or if not legally prohibited, unfit, in my opinion, to serve," and Gail had not indicated a willingness to serve.

The GAL affirmed his belief that the appointment of Besse as guardian would be in Brown's best interests.

After hearing arguments from the parties, the county court stated, "I see absolutely no basis to find that anything has changed from the last hearing that we were at," "[a]nd this will be the last time that I will entertain this, because I feel at this point in time it has been litigated and I do, to a degree, feel that it was litigated and brought up again because [the previous judge] . . . had to recuse herself and then I was brought on board." "And so I think it was seen as kind of a fresh shot at an apple." The court confirmed the prior order of the previous judge, and its own prior order from May 2023, that a guardianship was the least restrictive alternative care for Brown. The court appointed Besse to be Brown's permanent guardian.

(b) Motion for Sanctions

Billing invoices from the conservator's counsel, the GAL, and the conservator were received into evidence. Counsel for the conservator asked the county court to "assess fees for today's proceedings" which "would not be included in those exhibits that were filed"; counsel asked the court to take judicial notice that "today we had two hours of proceedings."

Clason's counsel stated he wanted to submit his own affidavit, and the affidavits of Clason and Clason's sister. The county court said it would allow those three affidavits, and then the GAL, counsel for the conservator, and Hildreth's counsel would have 10 days to respond to those affidavits and then the matter would be taken under advisement.

7. JUNE 16, 2023, ORDER APPOINTING PERMANENT GUARDIAN

In a journal entry and order entered on June 16, 2023, the county court memorialized what occurred at the hearing that day, including its appointment of Besse as the permanent guardian, and Heartland Trust Company as permanent conservator. The court set forth deadlines for the

parties to submit affidavits and arguments regarding the motion for sanctions. The court stated that the case was "[t]aken under advisement."

On July 17, 2023, Clason filed a notice of appeal. However, on August 25, this court dismissed Clason's appeal for lack of jurisdiction because the county court had not yet resolved the request for sanctions and attorney fees; this court's mandate issued on September 29.

### 8. NOVEMBER 1, 2023, ORDER FOR ATTORNEY FEES

In its 25-page order entered on November 1, 2023, the county court stated, "[T]his matter comes before the Court for findings after having been taken under advisement on the request for sanctions filed by [counsel for the conservator] . . . in a pleading on May 24." The court noted that counsel for the conservator was requesting sanctions be imposed against Clason and his attorney, and the request for sanctions was joined by the GAL; "[t]he sanctions requested are for attorneys' fees associated [sic] the proceedings held on May 26, 2023, and June 16, 2023." The court gave a detailed history of the case up to that point. It then granted the request for attorney fees and entered judgment against Clason and his attorney "for filing frivolous pleadings and acting in bad faith during the proceedings which resulted in expenses for the Conservator and [GAL], and by extension Mr. Brown." The court ordered a judgment in favor of the GAL in the amount of $5,350 against Clason and his attorney, jointly and severally. And the court ordered a judgment in favor of the counsel for the conservator in the amount of $4,025 against Clason and his attorney, jointly and severally.

Clason appeals.

### III. ASSIGNMENTS OF ERROR

Clason assigns (1) that the first judge erred in declining to remove Hildreth as guardian and to instead recognize Brown's durable power of attorney as being his least restrictive and more appropriate manner of oversight. Clason also assigns that the second judge erred (2) in declining Clason's requests to withdraw from an earlier stipulation, to vacate the prior proceedings, and dismiss the case, again, in favor of the valid and durable power of attorney that Brown had executed 2 years prior to Hildreth's petition; and (3) in determining Clason's requests to withdraw from an earlier stipulation, to vacate the prior proceedings, and to dismiss the case, were frivolous and made in bad faith, and that those requests comprised a basis for awarding attorney fees to the GAL and to the counsel for the conservator.

### IV. STANDARD OF REVIEW

An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record in the county court. *In re Guardianship of Nicholas H.*, 309 Neb. 1, 958 N.W.2d 661 (2021). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020).

## V. ANALYSIS

### 1. FAILURE TO REMOVE HILDRETH AS GUARDIAN AND RECOGNIZE CLASON'S POWER OF ATTORNEY

Clason argues that at the temporary guardianship hearing on February 13, 2023, the initial judge was "clearly mistaken" when she denied Clason's request to remove Hildreth as Brown's guardian because Brown had previously executed a durable power of attorney naming Clason and Gail his attorneys-in-fact. Brief for appellant at 17. And "[t]here was no indication, other than the desires of . . . Hildreth, that it was either necessary or desirable for the appointment of either a guardian or conservator." *Id.* However, any issues relating to the granting and extension of the temporary guardianship and conservatorship became moot upon entry of the permanent guardianship and conservatorship. See *In re Trust Created by Nabity*, 289 Neb. 164, 854 N.W.2d 551 (2014).

### 2. MOTION TO WITHDRAW STIPULATION

Clason next argues that the replacement judge "was mistaken in declining Clason's requests to withdraw from an earlier stipulation, to vacate the prior proceedings, and to dismiss the case . . . in favor of the valid and durable power of attorney." Brief for appellant at 20.

The Nebraska Supreme Court has said that in Nebraska, parties are free to make stipulations that govern their rights, including the issues to be decided, and that such stipulations will be respected and enforced by courts so long as the agreement is not contrary to public policy or good morals. *Parks v. Hy-Vee*, 307 Neb. 927, 951 N.W.2d 504 (2020). See, also, *In re Estate of Mithofer*, 243 Neb. 722, 502 N.W.2d 454 (1993) (stipulations voluntarily entered into between parties to cause or their attorneys, for government of their conduct and control of their rights during trial or progress of cause, will be respected and enforced by courts, where stipulations are not contrary to good morals or sound public policy). After an agreement to compromise and settle a controversy has been entered into by the interested parties, the original matter in dispute is not a proper subject of suit or defense where fraud, mistake, or duress in procuring the contract is not pleaded. *In re Estate of Mithofer, supra*.

At the hearing on April 10, 2023, Clason's counsel informed the county court that, after speaking with Clason, they were willing to agree to Brown's diminished capacity and need for a guardian and conservator in this case, and they agreed to the appointment of Heartland Trust Company as conservator; counsel confirmed that he was "offering a stipulation." The GAL joined in the stipulation. Clason and Hildreth both personally confirmed to the court that they were stipulating to the need for a permanent guardian and conservator. And Clason and Hildreth both personally confirmed their agreement to have Heartland Trust Company appointed as the permanent conservator.

In May 2023, Clason sought to withdraw his stipulation, remove the fiduciaries, and dismiss the action. He argued, and continues to argue, that subsequent events--Hildreth's removal as temporary guardian and the withdrawal of her attorney--somehow changed the circumstances. However, as the appellees point out in their brief, "A guardian's removal for wrong doing in no way [a]ffects the underlying need for a guardian and conservator." Brief for appellees at 25. It is clear from the record that all issues regarding Hildreth's suitability to serve as guardian were

known prior to the parties' stipulation. And, as noted by the county court, "Clason did not plead fraud, mistake, or duress in his Motion to Withdraw from Stipulation."

The county court stated, "[T]here was a stipulation . . . by all the parties, including Mr. Clason, the [GAL], and at that point, the temporary guardian, Ms. Hildreth, that Mr. Brown was, in fact, incapacitated to the point that a guardianship was required, as well as a conservatorship"; "The stipulation was specifically approved by the Court." "There's been no showing of duress on Mr. Clason that he did not freely, knowingly, intelligently and voluntarily enter into that conservatorship." There was no new medical information showing that Brown's situation had improved, "and, in fact, according to the [GAL's] report, his condition has deteriorated to the point he's in a memory care unit," reinforcing for the court that "the proper and least restrictive alternative for Mr. Brown was a guardianship." The court overruled Clason's motion to withdraw from the stipulation.

After hearing testimony from Swartzentruber and the GAL, and arguments from the parties, the county court also overruled Clason's motions to remove the fiduciaries and dismiss the proceedings. The court, once again, noted the April 2023 stipulation wherein the parties stipulated that Heartland Trust Company would serve as the conservator in this matter; it also found that Heartland Trust Company had fulfilled its duties and continued to fulfill its duties.

We find no clear error appearing on the record. The county court's decision conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. See *In re Guardianship of Nicholas H., supra*.

### 3. SANCTIONS

Clason contends that the county court abused its discretion in awarding attorney fees to the GAL and to counsel for the conservator based on its finding that Clason's requests to withdraw from an earlier stipulation, to vacate the prior proceedings, and to dismiss the case, were frivolous and made in bad faith.

Neb. Rev. Stat. § 25-824(2) (Reissue 2016) provides, in relevant part, that

in any civil action commenced or appealed in any court of record in this state, the court shall award as part of its judgment and in addition to any other costs otherwise assessed reasonable attorney's fees and court costs against any attorney or party who has brought or defended a civil action that alleges a claim or defense which a court determines is frivolous or made in bad faith.

And Neb. Rev. Stat. § 25-824.01 (Reissue 2016) states:

In determining the amount of a cost or an attorney's fee award pursuant to subsection (2) of section 25-824, the court shall exercise its sound discretion. When granting an award of costs and attorney's fees, the court shall specifically set forth the reasons for such award and shall, in determining whether to assess attorney's fees and costs and the amount to be assessed against offending attorneys and parties, consider the following factors, including, but not limited to: (1) The extent to which any effort was made to determine the validity of any action or claim before the action was asserted; (2) the extent of any effort made after the commencement of an action to reduce the number of claims or defenses being asserted or to dismiss claims or defenses that have been found

- 13 -

not to be valid; (3) the availability of facts to assist the party to determine the validity of a claim or defense; (4) the relative financial position of the parties involved; (5) whether or not the action was prosecuted or defended in whole or in part in bad faith; (6) whether or not issues of fact, determinative of the validity of a party's claim or defense, were reasonably in conflict; (7) the extent to which the party prevailed with respect to the amount of and number of claims in controversy; (8) the amount or conditions of any offer of judgment or settlement in relation to the amount or conditions of the ultimate relief granted by the court; (9) the extent to which a reasonable effort was made to determine prior to the time of filing of a claim that all parties sued or joined were proper parties owing a legally defined duty to the plaintiff or defendant; and (10) the extent of any effort made after the commencement of an action to reduce the number of parties in the action.

The Nebraska Supreme Court has stated that attorney fees shall be awarded against a party who alleged a claim or defense that the court determined was frivolous, interposed any part of the action solely for delay or harassment, or unnecessarily expanded the proceeding by other improper conduct. *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020). A frivolous action is one in which a litigant asserts a legal position wholly without merit; that is, the position is without rational argument based on law and evidence to support the litigant's position. *Id.* The term "frivolous" connotes an improper motive or legal position so wholly without merit as to be ridiculous. *Id.* Any doubt about whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question. *Id.*

The county court's order complied with § 25-824.01 by specifically setting forth the reasons for its award of attorney fees, and by considering the relevant factors for such award.

In its order, the county court stated that the "crux of [counsel for the conservator's] argument is that unnecessary legal fees were incurred by Heartland Trust and the [GAL] due to the repeated attempts of Mr. Clason to withdraw from the stipulation and to have the guardianship/conservatorship dismissed" and "[counsel for the conservator] argue[d] that the pleadings and on-going litigation were of a frivolous nature and presented in bad faith"; counsel for the conservator was "seeking attorney's fees for the preparation and time involved in the hearings held on May 26, 2023, and June 16, 2023." The GAL "seeks essentially the same relief," and "points to the subsequent [GAL] reports that were prepared in anticipation of and in response to Mr. Clason's attempts to withdraw from the stipulation and to have the guardianship/conservatorship dismissed."

The county court found that Clason's motion to withdraw from the earlier stipulation, to vacate the prior proceedings, and to dismiss the case were frivolous and made in bad faith. The court stated

[its] impression is that the Motion to Withdraw from Stipulation was filed in bad faith as there is no allegation of fraud, mistake, or duress let alone any evidence adduced demonstrating such. In addition, there was no discernable change in any of the factors that lead to the Court's finding that Mr. Brown was in need of a permanent guardian/conservator. . . . When given the opportunity to present evidence that Mr. Brown's condition or circumstances were improved, [Clason's counsel] could not provide any. . . . The one factor that seemed to have triggered the flurry of pleadings from Mr.

- 14 -

Clason, was the recusal of [the previous judge]. At the May 26th and June 16th hearings, the Court was quite frank with the parties and stated, on the record, the Court's impression was [Clason and his counsel] were attempting to relitigate settled matters based on nothing other than the appointment of a new judge. After reviewing the record, the Court's view has not changed.

The court also found that once it determined that Clason was bound to the stipulation, the motion to discharge fiduciaries and motion to dismiss also failed, for much of the same reasoning stated above. The court therefore found that the motion to discharge fiduciaries and motion to dismiss were frivolous and filed in bad faith.

The county court stated that separate from the motion to withdraw from stipulation, Clason "filed a Nomination in which he nominated himself and [Gail] to serve as guardian and conservator for Mr. Brown." The court found the nomination was frivolous and filed in bad faith because Clason "was clearly on notice that he was unsuitable to serve as guardian/conservator" due to his criminal history and that Gail had declined to serve as guardian/conservator "throughout the proceedings"; although "Clason ultimately withdrew the nomination of himself and [Gail], he did not do so until well into the evidentiary hearing held on May 26, 2023, and only after the Court ruled that the Motion to Withdraw from Stipulation would not be granted." The court further found that "the filing of the Nomination forced [the GAL and the counsel for the conservator] to prepare to oppose his Nomination at trial, with very little notice," and "[g]iven the Court's prior findings regarding Mr. Clason's fitness, and [Gail's] stated refusal to accept appointment, the withdraw [did] not negate the wasteful impact of the Nomination."

The county court stated that at the hearing for appointment of a permanent guardian on June 16, 2023, "[Clason's counsel] continued to object to the appointment of a permanent guardian and wanted to seek a dismissal of the proceedings." The court gave Clason's counsel some leeway to adduce evidence of a change of circumstances that would negate the court's prior order, but the testimony established that there was no such change of fact or circumstance. "Even when it became clear that no change in circumstance had occurred, [Clason's counsel] continued to try to elicit testimony from [the GAL] that Mr. Brown's care could be maintained with the prior arrangement of him residing in his home with Mr. Clason under the durable power of attorney," but "[t]he overwhelming amount of testimony elicited by [Clason's counsel] did not support [his] arguments and assertions" and "[i]n fact, the testimony was contrary to his argument and in favor of the Court's prior rulings." The court found that Clason and his counsel "had to have been aware, prior to the commencement of the hearing, that they could offer no evidence to support their argument that a dismissal was appropriate."

The county court stated that at the close of evidence Clason's counsel received permission to submit affidavits on the issue of attorney fees. The court noted that in counsel's affidavit, "[counsel] references the research he performed before he came to the conclusion that a reasonable basis existed to attempt to reopen and revisit the merits of the proceedings," and "[counsel] contends he concluded that based on the law and Mr. Clason's good faith conviction, the right thing to do was to have the case dismissed and Mr. Brown returned to Mr. Clason's care." However, the court found that "[counsel's] research should have led him to the conclusion that

Mr. Clason did not have a legitimate argument to withdraw from the stipulation, which would have in turn negated the arguments made in the Motion to Dismiss, and Nomination."

The county court found that "the party who is most affected by the on-going proceedings is Mr. Brown," whose estate will be charged for the services of the GAL and the conservator. "Mr. Brown is a vulnerable person, and his assets are needed for his on-going care." Brown "did not initiate the prolonged legal proceedings," and "should not have to bear the financial responsibility for litigation the Court has found to be frivolous and pursued in bad faith."

The county court determined that the GAL's claims for attorney fees "are reasonable and should be granted as requested in the amount of $5,350 which is 21.4 hours of work × $250.00/hour." The court also found that the counsel for the conservator's claims "are reasonable and should be granted as requested in the amount of $4,025 which is 16.1 hours of work × $250.00/hour." The court "took judicial notice of the prior order entered by [the previous judge] on May 4, 2023," wherein "[the previous judge] made a ruling that $250 per hour was a fair and reasonable sum for attorney fees."

The county court did not abuse its discretion in finding that Clason's requests to withdraw from the stipulation, to vacate the prior proceedings, and to dismiss the case, were frivolous and made in bad faith. As for the amount of attorney fees awarded, we again find no abuse of discretion.

## VI. CONCLUSION

For the reasons stated above, we affirm the June 16 and November 1, 2023, orders of the county court.

AFFIRMED.